| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE DISTRICT OF OREGON |

```
 3   ROBERT M. LYDEN, an        )
     individual,               )
 4                             )
              Plaintiff,       )  Case No. 3:14-cv-01586-MO
 5                             )
         v.                    )
 6                             )
     ADIDAS AMERICA, INC., a   )  November 6, 2015
 7   Delaware corporation, et al., )
                               )
 8            Defendants.      )  Portland, Oregon
     _____)
 9
10
11
12
13
14
15                      **Markman Hearing**
16                  TRANSCRIPT OF PROCEEDINGS
17          BEFORE THE HONORABLE MICHAEL W. MOSMAN
18            UNITED STATES DISTRICT COURT JUDGE
19
20
21
22
23
24
25
```

```
 1
 2                              APPEARANCES
 3
 4   FOR THE PLAINTIFF:      Mr. Robert M. Lyden, pro se
                             18261 S.W. Fallatin Loop
 5                           Aloha, OR 97007
 6
 7
 8   FOR THE DEFENDANTS:     Mr. Matias Ferrario
                             Kilpatrick Townsend & Stockton LLP
 9                           1001 West Fourth Street
                             Winston-Salem, NC 27101-2400
10
11                           Mr. Stephen M. Feldman
                             Perkins Coie, LLP
12                           1120 N.W. Couch Street, 10th Floor
                             Portland, OR 97209-4128
13
14
15
16   COURT REPORTER:         Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
17                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
18                           (503) 326-8188
19
20   ALSO PRESENT:           Ms. Sara Vanderhoff
                             Mr. Christopher Wolpert
21
22
23
24
25
```

```
 1                    (P R O C E E D I N G S)
 2              THE CLERK:  Your Honor, this is the time and place
 3    set for a Markman hearing in Case 3:14-cv-01586-MO, Robert
 4    Lyden versus adidas America, Inc.
 5              Counsel, please identify yourself for the record.
 6              MR. FELDMAN:  Your Honor, Stephen Feldman of Perkins
 7    Coie on behalf of the defendants.
 8              I'd like to introduce to the Court my co-counsel,
 9    Matias Ferrario, and we have two company representatives from
10    adidas, Sara Vanderhoff and Christopher Wolpert.
11              THE COURT:  Thank you all.
12              Go ahead and introduce yourself on the record.
13              MR. LYDEN:  Yes.  I'm Robert Lyden, the plaintiff.
14              THE COURT:  All right.  I'm going to give each side a
15    couple minutes just to tell me what you think the core of this
16    dispute is about.  It's partly -- candidly, partly for me to
17    just hear it, and also for me to get a feel for what this is
18    going to sound like to a jury.
19              So I'll start with defendants.
20              MR. FERRARIO:  Thank you, Your Honor.  Matias
21    Ferrario here.
22              We've provided you with a presentation, I think, at
23    the outset.
24              MR. FELDMAN:  If we can --
25              THE COURT:  Yes, you can forward that.
```

1          MR. FELDMAN:  (Handing.)

2          THE COURT:  Go ahead.

3          MR. FERRARIO:  At this juncture, Your Honor, there

4    are two patents at issue here.  And of those two patents, there

5    are three claim terms which we think require construction, and

6    there are two terms that we contend are incapable of

7    construction and are indefinite.  And we have had a meet and

8    confer with Mr. Lyden prior to today's hearing to discuss how

9    to address those, and if you'd like to hear that, we've come to

10   an agreement where we would do it term by term with respect to

11   the two patents.  But we'd defer to Your Honor, of course.

12         THE COURT:  What I'd like first is your general

13   statement, if you have one ready, of what you think is at the

14   core of this dispute.

15         MR. FERRARIO:  Sure, Your Honor.

16         So there are three terms at the core of this dispute

17   here.  One is the term "affixed," and whether that means you

18   have to have separate pieces of the shoe that are attached to

19   each other, somehow affixed together.

20         The second issue is "anteriormost side."  And that

21   relates to the inferior spring element which comes off the

22   bottom of the shoe and whether that has to have all six

23   distinctive sides.

24         And then the third issue is this term "anterior

25   tangent point."  And the question is what does "tangent" mean

1    with respect to that term, and we think that that is a term

2    that requires construction.

3          Those are the three terms we think require

4    construction.

5          We think there are two terms that are indefinite.

6    Those terms are "said transverse axis" in the '878 patent, and

7    the other term is "similar to" in the '797 patent.

8          With respect to "said transverse axis," we think,

9    one, that there is improper antecedent basis because there is a

10   reference to "said transverse axis," and it is impossible to

11   know which transverse axis of the two transverse axes that the

12   claim is referring to; and second, with respect to "similar,"

13   we think there is no teaching within the patent as to how

14   similar something must be, it's a term of degree, and without

15   any further teaching in the patent, we do not think that it is

16   capable of construction.

17         THE COURT:  Thank you.

18         Do you wish to make a general statement of what you

19   think this is about?

20         MR. LYDEN:  Your Honor, I think he's done a pretty

21   good job in covering what we need to talk about today.  We have

22   different points of views on many of these things.

23         THE COURT:  Thank you.

24         MR. LYDEN:  That's about it.

25         THE COURT:  Let's do this term by term.  And so I'll

1    start with the phrase or term "similar to."

2          I have defendants' argument, not proposing a

3    definition but simply claiming that it's not capable of

4    definition; that it's indefinite.

5          What's your response to that?

6          MR. LYDEN:  It is capable, and I provided

7    information, and there is intrinsic evidence in the prosecution

8    of the patent to show what that is.

9          THE COURT:  The definition you provided is

10   "resembling without being identical," first of all.

11         MR. LYDEN:  Or --

12         THE COURT:  "Almost identical."

13         So let's take the first one.  You say something is

14   similar to means resembling without being identical.  I'm not

15   sure you've advanced the ball down the field very far.  You've

16   really just said the same thing in a clunkier way.  So I

17   probably wouldn't do anything with that definition.

18         "Almost identical" is a quantitative definition.

19   Where would you get the idea that it's almost identical as

20   opposed to something less than that towards the goal of being

21   identical?

22         MR. LYDEN:  Sure.  I get your point.

23         Your Honor, they have a presentation --

24         THE COURT:  Let's just -- do you have a green light

25   on your microphone, at the base of it there?  Is it on?

1      MR. LYDEN:  Yes, I do.  Do I need to get it closer?

2      THE COURT:  Why don't you remain seated and pull it

3   closer to you, and that will help us.

4      MR. LYDEN:  (Complies.)

5      The defendants have a presentation today.  I had

6   prepared my notes and a brief, essentially, and I've already

7   given that to them, and if you would like, I can give you a

8   copy of it and then you would be able to follow what I'm going

9   to say and have a record of it and be able to reference

10  something.

11     THE COURT:  You can hand a copy forward.

12     Here's how this is going to go.  I have certain

13  questions, and answering those questions might not take 150

14  PowerPoint slides to get there.  And so if it doesn't, then we

15  won't see those.

16     So go ahead and hand those to Mr. Bean.

17     MR. LYDEN:  (Complies.)

18     THE COURT:  Right now I just wanted to ask you to

19  answer my question.  Where do you get from intrinsic evidence

20  the idea that "similar to" means almost identical?

21     MR. LYDEN:  During the prosecution of the patent, the

22  examiner had raised the indefiniteness issue, and there was

23  discussion by the examiner about curvatures and the components

24  that were involved; in particular, the inferior spring

25  elements.  And in my patent, the superior spring is the part on

1    top, and the inferior part is the one that ramps down like a

2    ski ramp kind of like.

3              And in the claims there's two inferior spring

4    elements that are positioned across from one another, and I

5    defined in the claims that the top curvature of these two

6    spring elements are similar to one another.  And during the

7    prosecution of the patent, I provided to the examiner photos of

8    actual prototypes that I had made showing inferior spring

9    elements.

10             As a matter of fact, one of the images, which is on

11   page 30 in something I've given you, is an inferior spring

12   element that was actually made by cutting it down the middle.

13   So both parts have, insofar as you can do in manufacturing, an

14   identical curvature on the top side.

15             Now, what the differences were between the two is

16   because one is on the medial side, which is the inside of the

17   shoe (indicating), and one of them lays on the outside, kind of

18   like this one (indicating), and when you have a part like that,

19   and especially if you make it out of carbon fiber steel, or

20   even in this case plastic, if you leave a sharp scissors-like

21   edge there, you've got something that will cut somebody.  And

22   so what you do is you bevel or taper the edge, and so even

23   though the top curvature of the springs in all other aspects

24   may be identical or nearly identical at the lateral side and

25   the medial side, there's some tapering going on on the top side

1  because you put a bevel on it.

2          And that was really what was discussed and shown to

3  the examiner that I can't -- you know, I can't say that they

4  are absolutely identical, but they are substantially so, and --

5  and they are similar to one another, with the exception --

6          THE COURT:  I need you to pause -- I need you to

7  pause if I ask you a question.

8          MR. LYDEN:  Sure.

9          THE COURT:  We have a court reporter taking it down.

10         So what we're looking for is how someone reading the

11 patent would know what "similar to" means.  So your explanation

12 of how the manufacturing process works here in court today

13 won't help in that effort at all.  We're stuck with a closed

14 universe of words that you can point to that define the phrase

15 "similar to."

16         Now, that can include what happened in the

17 prosecution history.  So I need you to tell me where you're

18 relying on in the prosecution history that someone reading the

19 prosecution history can figure out that "similar to" means

20 almost identical to.

21         MR. LYDEN:  Right.

22         THE COURT:  What text are you relying on for --

23         MR. LYDEN:  That is in what I've provided to you just

24 now, and that is in -- yeah, it's in Exhibit M-13.  And it's --

25 in particular, in M-13, if you were to look at this -- and it's

1    pages 27 to 30, 39 to 40, and in particular, 57 to 62.  And at

2    pages 57 to 62, I am discussing this with the examiner,

3    specifically this subject, and -- and state why the language is

4    being used and also discussing some things about the shape of

5    the inferior spring elements and the differences there and some

6    things that I thought would be helpful to the examiner.

7         So there is a spot that you can look right in the

8    prosecution where you can see the figures, you can see the

9    discussion that went on, and anyone looking at that discussion,

10   a person skilled in the art would know, okay, if we make a

11   inferior spring element that has the same top curvature on the

12   medial and lateral sides, and all we've got is just differences

13   in the beveling at the edges, we're going to be infringing,

14   because it was very clearly talked about as to how and why that

15   language "similar to," what that meant, and that is what it

16   meant.

17        THE COURT:  When in this discussion do you link the

18   description to the phrase "similar to"?  I see the description,

19   but I don't see how one reading it would know that you're

20   defining the phrase "similar to."  I mean, since I'm only just

21   glancing at it, I may have missed that.  Where is that?

22        MR. LYDEN:  Let me show you, because I think I saw

23   the reference.  I'll try to find that.

24        So if you'll look at Exhibit No. 13, you can see on

25   page 4 there is a photo of the inferior spring element --

1    actually, there's two of them, and it was made by cutting right

2    down the middle so that they have the exact same top curvature

3    and they're beveled on --

4           THE COURT:  So I've heard you say that, and since my

5    time is limited, I need you to focus on the question I'm

6    actually asking you.  So, ideally, if this -- if you were

7    giving me the perfect evidence, you'd point in the prosecution

8    history to where you told the Patent Office that "similar to"

9    means almost identical to.  Obviously, you don't have that.  So

10   where is it that you tell the Patent Office what "similar to"

11   means?  And so the photograph won't get you there.

12          MR. LYDEN:  Right.

13          I believe it's here.

14          (There is a pause in the proceedings.)

15          THE COURT:  Do you have it?

16          MR. LYDEN:  I've got these scattered within about

17   five pages of discussion about not only the curvature but the

18   shape of the object.

19          THE COURT:  Let me make your search simpler.  Show me

20   anywhere in those five pages where the words "similar to"

21   appear.

22          So I'm going to come back to you on that question.

23          Let me ask a related question.  Typically, a patent,

24   if it used a phrase like "similar to," would be claiming all

25   forms of similarity from as close as you can get to identical

1    to as far away as you can get from identical and still be

2    similar.  And so a discussion that a particular embodiment or

3    manufacturing process might produce pairs that are similar, in

4    the sense of being almost identical, wouldn't disclaim a

5    broader interpretation unless you had more than that.

6            Do you have more than that?

7            MR. LYDEN:  (No response.)

8            THE COURT:  Or did you hear my question?

9            MR. LYDEN:  I heard your question.  I believe I have

10   more than that, but --

11           THE COURT:  I'm going to turn to your opponent while

12   you look for the phrase "similar to."  What I'm going to do is

13   turn to your opponent while you look for the phrase "similar

14   to" in the prosecution history.

15           Let's assume it's in there, or something like it is

16   in there.  What do you make of that other otherwise intrinsic

17   evidence?

18           MR. FERRARIO:  Yes, Your Honor, that is a good

19   question.  And I believe it is in there, and perhaps to help

20   out there, I think we cite to it in our brief that there is a

21   line on page 9 of what is, I think, M-13, what we'll call M-13,

22   that does provide this boundary of -- this picture which I have

23   in front of you is being discussed in that section.  It shows

24   these curves as being similar, having similar curve shapes.

25           And I think to a question you asked earlier, maybe

1    that provides one boundary of this objective boundary that's

2    required under *Nautilus* and *Interval Licensing* case law.  And I

3    say maybe because it's not entirely clear, well, what is still

4    almost identical in that case.

5         But there is nothing on the other end of that

6    boundary which is required by case law, which is to say you

7    need to understand what's not similar.  And I think if you look

8    at the specification and you look at the prosecution history,

9    that is the piece that's just missing.

10        THE COURT:  So your argument is that one iteration of

11   being similar can be almost identical, but there's nothing that

12   says every other iteration of being similar is somehow

13   disavowed by the patent?

14        MR. FERRARIO:  That's right.  And I think that you'll

15   find similar reasoning in the *ACQIS* decision that we cited in

16   our case.  And it had the exact same thing, where the plaintiff

17   had argued that there was a design -- a circuitry design that

18   was identical.  It was identical, they kept saying, and then

19   they said, well, and all of these other figures are completely

20   different.  The court there found that there was no objective

21   boundary to determine what's similar and what's not similar,

22   and for that reason, the claim term was indefinite.

23        THE COURT:  Thank you.

24        Do you wish to speak further to what those five pages

25   or other pages of M-13 teach about this phrase?

1          MR. LYDEN:  Well, I think he did find the words

2    "similar," and I think he forgot -- yeah, that page, which is

3    page 15 of M-13, talks about the two inferior spring elements.

4    It talks about their shape and it talks about them having

5    similar curved configurations.  And what's made clear is that

6    the top curvature of the two is the same except for what goes

7    on on the medial and lateral sides.

8          So I think by my discussion, combined with the image

9    that I provide, provided sufficient disclosure to someone

10   skilled in the art that they would realize that if they wanted

11   to avoid infringement, they would make the inferior spring

12   elements on the medial and lateral sides have a different top

13   curvature.

14         THE COURT:  Thank you.

15         I want to take up the next phrase that's said to be

16   indefinite, the "said transverse axis."

17         If I understand the defendants' position, one of the

18   reasons you think it's indefinite is that you can't locate the

19   transverse axis as between running through the spring elements

20   versus running through the bottom of the shoe.  Is that right?

21         MR. FERRARIO:  Yes, Your Honor, that's right.

22         THE COURT:  What else makes it indefinite, in your

23   view?

24         MR. FERRARIO:  Sure.  So that's the part where we say

25   is the antecedent basis problem because the claim taught there

1   says footwear having a transverse access, the spring element

2   having a transverse axis, and then later refers to "said

3   transverse axis," and our contention is you can't tell which

4   one --

5        THE COURT:  So just for my purposes, looking at the

6   phrase, that's why you think the word "said" is troubling here,

7   from your perspective?

8        MR. FERRARIO:  That's right.  So under typical claim

9   drafting, in black letter claim construction drafting, "said,"

10  the definite article refers to -- the article that's

11  introduced, the component that's introduced with an indefinite

12  article.  So there's a first thing, a second thing.

13       THE COURT:  All right.  And if I remember correctly,

14  then, your second problem is you're not sure that one skilled

15  in the art would know where to place the transverse axis on the

16  longitudinal axis, right?

17       MR. FERRARIO:  That's correct, Your Honor.

18       THE COURT:  Well, in one of your proposed

19  definitions -- you may have moved away from that by now -- you

20  place it at the triple intersection of the transverse axis, the

21  longitudinal axis, and the flexural axis, right?

22       MR. FERRARIO:  That's right.

23       THE COURT:  And that would be a clearly identified

24  point if it were correct, wouldn't it?

25       MR. FERRARIO:  That's right.  We would agree with

that.  There is disclosure of that in the '878 patent.

The problem with that is -- and I think we've kind of moved away from an alternative construction because it's looked at in the '797 specification, there are very clear pictures of the flexural axis and the transverse axis not lining up.  So there is no X marks the spot.  And this is the teaching of the patent that we think supports the notion that the '878 patent doesn't provide for the location along the longitudinal axis of where this transverse axis is.

THE COURT:  Doesn't provide it not so much by the indefiniteness of the phrase itself but because of multiple possible locations?

MR. FERRARIO:  That's exactly right.

THE COURT:  In the intrinsic evidence?

MR. FERRARIO:  Yes, that's exactly right.

And ultimately the problem here, as well as -- well, I guess the question would be why does it matter.  And the reason it matters is because the claim element that follows, which requires one to measure the concavity downwards and the length of the side of this inferior spring element is measured from a reference point.  That reference point is the transverse axis.  And if you can move that transverse axis -- it's always 90 degrees, we know that, but if you can move it up and down the longitudinal axis indefinitely, you just don't know.  You don't know whether your inferior spring element is longer on

1   one side or has greater concavity because that transverse axis

2   can be anywhere along the longitudinal axis.

3           THE COURT:  Thank you.

4           Is there a way one skilled in the art would know

5   where to put the transverse axis on the longitudinal axis?

6           MR. LYDEN:  Yes.

7           THE COURT:  I should say is there one and only one

8   way, as opposed to multiple ways one would know where to put

9   it?

10          MR. LYDEN:  I can speak to how I did it.  I can't say

11  how someone else might come to the same thing.

12          THE COURT:  Well, oddly enough, how you did it is

13  irrelevant to my decision.  It's precisely how one skilled in

14  the art would do it that matters.

15          MR. LYDEN:  Well, you know, there's a point here I'd

16  like to make about the two patents.  The earlier patent was the

17  first filed in a chain that became pretty lengthy.  The second

18  patent that we're speaking about today was filed about 12 years

19  later, and it was the product of about four continuations in

20  part.

21          Some of the case law that the defendants have cited,

22  it's a little misleading as to whether you can read from

23  disclosure in a later patent and try to bring it back into an

24  earlier one.  You know, they cited -- I believe it was

25  *Microsoft* and *Jonsson v. Stanley Works*.  And the difference

1    between those cases and this one is that they dealt with

2    patents in a chain that were continuations.  They had the

3    identical specification, they had the identical drawings.  All

4    that was happening there was people were putting new claims and

5    getting new patent.  So there was no continuation, there was no

6    new matter.

7              My earlier patent has 29 drawings.  The later one has

8    629.  There's 600 drawings difference and hundreds of pages of

9    disclosure differences between the two.  And I departed from

10   the specific orientation of the three axes in the first one

11   when I did the second one because I wanted to claim new and

12   different matter.

13             So in the first patent that we're looking at, the X

14   marks the spot where the longitudinal axis, the flexural axis,

15   and the transverse axis all meet is really very clearly

16   defined, and anyone looking at it knows exactly where it is.

17   There's no bones about it.  So it's very definite in the

18   earlier patent what that is and what that's about, and I don't

19   think there could be any question about where it is.

20             The axes, longitudinal and transverse axes were

21   introduced, you know, for the same reason you have longitude

22   and latitude.  When you want to speak about the object and you

23   want to say something about the orientation of the inferior

24   spring elements, what angles they come off, you have to have a

25   reference point.  So all the longitudinal and transverse axes

1    do is give you a reference point.

2              The defendants, you know --

3              THE COURT:  Let me ask you this.  In the '797 patent

4    are you attempting to claim a transverse axis that can be

5    placed anywhere along the longitudinal axis?

6              MR. LYDEN:  I don't believe that it's relevant to

7    most of the claims in that patent.  In the earlier patent --

8              THE COURT:  Well, before we get to relevance, just

9    start with your answer to my question.

10             You've suggested that you claimed something different

11   on this score in the '797 patent --

12             MR. LYDEN:  Right.

13             THE COURT:  -- than the '878 patent.  So now I'm

14   asking are you claiming in the '797 patent that there are

15   multiple places along the longitudinal axis that one could find

16   the transverse axis?

17             MR. LYDEN:  I think I'd have to look at all 20 claims

18   before I could give you an intelligent answer there.

19             THE COURT:  Well, I thought that the answer was

20   simple, in light of what you've just said, so let me make sure

21   I understand you.

22             MR. LYDEN:  Well, it's very simple --

23             THE COURT:  Let me finish my question.

24             MR. LYDEN:  Sure.

25             THE COURT:  So I guess I could flip it around and say

1    are you claiming in the '797 patent that the transverse axis

2    must meet along the longitudinal axis where those two intersect

3    with the flexural axis?  In other words, is X marks the spot

4    true of the '797 patent also or just the '878 patent?

5            MR. LYDEN:  It is true, but in the latter patent,

6    I -- some of the embodiments that I taught showed what happens

7    if you move an inferior spring element to the left or to the

8    right along the transverse axis.  And so the inferior spring

9    element will -- will sometimes not have, if it's a single

10   spring, it's still going to have an intersection point.  If

11   it's a pair side by side, it may not intersect with the

12   flexural axis of the two because it's splitting down the middle

13   and it's deadening between them.  And --

14           THE COURT:  Is that intended to be an embodiment that

15   represents an embodiment that follows the patent?

16           MR. LYDEN:  Yes.

17           THE COURT:  So then for that to be true, you'd have

18   to be claiming in '797 something a little broader than you're

19   claiming in '878, wouldn't you?

20           MR. LYDEN:  It's a different set of claims directed

21   to some different structures, so it doesn't quite -- I don't

22   know that broadness of scope is so much the issue.

23           THE COURT:  Well, you've talked about where you put

24   the springs.  I'm not so much concerned about the spring as

25   where the transverse axis is found.

1          MR. LYDEN:  Right.

2          THE COURT:  So splitting the springs down the middle

3    doesn't tell me one way or the other where you're putting the

4    transverse axis.  I don't really care where the springs --

5          MR. LYDEN:  Well, the transverse axis is always going

6    to be perpendicular to the longitudinal, and it's always going

7    to intersect some part of the flexural axis, but it may not

8    intersect the flexural axis dead center in the middle of the

9    shoe.  It may be offset to the side.  That's the only

10   difference in that patent versus the earlier one.

11         THE COURT:  So can the transverse axis in the '797

12   patent intersect the longitudinal axis in '797 at a spot other

13   than where the flexural axis intersects the longitudinal axis?

14         MR. LYDEN:  Yes.

15         THE COURT:  And that would not be true of '878,

16   right?  In '878, they all --

17         MR. LYDEN:  No.

18         THE COURT:  -- three come together at the same spot?

19         MR. LYDEN:  Correct.  In '878 they all come together

20   in one spot like a duplex in a scope, you know.

21         THE COURT:  Thank you.

22         You proposed a definition at one time of "said

23   transverse axis" that would sort of go along with this

24   colloquial idea of X marks the spot.  Did you back away from

25   that because of evidence from the '797 patent, or is some of

1  that evidence -- that is, evidence that's inconsistent with all

2  three axes coming together in one spot associated with the '878

3  patent?

4          MR. FERRARIO:  I think, Your Honor, that in having

5  looked at the '878 patent and trying to understand what

6  teachings it had about the location of the --

7          THE COURT:  I'm going to stop you there.  So --

8          MR. FERRARIO:  I was going to say both.

9          THE COURT:  All right.  That's what I was hoping for.

10  Let's start with an answer and then amplify so I know where

11  your answer is going.

12          So you do believe that you have evidence that -- from

13  intrinsic evidence from the '878 patent that shows -- or that

14  teaches that the transverse axis can be somewhere else on the

15  longitudinal axis?

16          MR. FERRARIO:  What I think -- the way I would put it

17  is that there isn't -- there's an absence of evidence on the

18  '878 as to whether the transverse axis is limited to that one

19  particular point.

20          THE COURT:  All right.  Let's assume that in '878

21  that's true, that they all come together in one spot.  And

22  let's assume for a moment that that picture changes somehow the

23  '797 patent.  So the claim we're construing comes out of '878.

24  What happens if we construe it only for purposes of '878 in a

25  way that might not be true of '797?  Where are we?

1          MR. FERRARIO:  So we're -- so in that case you have a

2    CIP, so you add new matter.  And the question there would be

3    what parts of the teachings of the CIP in the new matter,

4    including form, what's interpretation of the claim terms of the

5    '878 patent.  And I would think that to the extent that the

6    '878 patent had some terms that were less than fully described

7    and defined, then those teachings would inform one or a part of

8    the intrinsic record.  They should be considered in the

9    totality of the intrinsic record to understand the meaning of

10   the term in the '878 patent.

11         THE COURT:  Why is that the case instead of assuming

12   that the inventor tried to claim something broader in the '878

13   patent -- or excuse me, in the '797 patent?

14         MR. FERRARIO:  So I think there the question would be

15   is it directed to a new embodiment, something that's broader.

16   And I think, from my perspective, looking at these disclosures,

17   it's because the inventor was using the exact same terms and

18   was describing the embodiments in the exact same way.  And so

19   it wasn't distinguished as here is a new embodiment.

20         THE COURT:  Well, if you were in '878 willing to --

21   excuse me, if in '878 you were going to lock the transverse

22   axis on to a particular point along the longitudinal access,

23   and if in '797 you weren't going to lock it in, you were going

24   to allow it to occur in multiple places, and in both patents

25   you'd use the identical terms, right?  You'd still be talking

1    about a flexural axis, a longitudinal axis, and a transverse

2    axis.  You just wouldn't be talking about them in terms of

3    locking them in in the same spot.  So I wouldn't be surprised

4    that the same terms would occur.  That wouldn't change, right?

5                MR. FERRARIO:  I think that's a fair comment, Your

6    Honor.

7                THE COURT:  Let's take the third of the ones we're

8    considering, and that's the anterior -- I'm going to take

9    "anterior tangent point" next.  And here the parties proposed

10   definitions that are functionally and fundamentally pretty

11   similar, but I don't mean "similar" in the sense of being

12   almost identical to.  So we can agree on that.

13               And for that reason I'm curious -- and I'll start

14   with defendants -- really where is the difference between these

15   two proposed definitions, yours and Mr. Lyden's?

16               MR. FERRARIO:  Sure, Your Honor.  Two differences.

17   One is the line in our proposal has to be a straight line.  In

18   our view, that's all that's ever shown in the '797 patent.

19   It's line 160 in, for example, figures 520 and 523, and it's

20   expressly defined in the specification as previously defined

21   here, with the inventor acting as his own lexicographer.  So

22   that's dispute number one.

23               Dispute number two comes down to essentially what

24   does "tangent" mean.  And tangent is not an intersection

25   between two lines.  It requires something more than that as a

1    meaning.  And our proposed definition is intended to capture

2    that, that there is some point between these two surfaces where

3    they were previously parallel and then no longer parallel,

4    which would provide for an area, a point on that top surface

5    where something could be tangent to that top surface.

6              Those are the two disputes between the parties.

7              THE COURT:  So just so I'm clear on your

8    demonstrative exhibit that I have in front of me here, the "not

9    this" posits that there's no parallel running of the red and

10   green lines.  The green line just comes off the red line.  The

11   first you see, or whatever the green line represents is when it

12   breaks away from the red line?

13             MR. FERRARIO:  That's right.

14             THE COURT:  So I want to make sure you're not running

15   the two together underneath the word "not" there somehow.

16             MR. FERRARIO:  No.

17             THE COURT:  So what you mean is just on the left

18   where they are momentarily at least parallel?

19             MR. FERRARIO:  That's right.

20             THE COURT:  Thank you.

21             So your concern is that the language suggested by the

22   plaintiff would allow the "not this," and I'm not sure I'd know

23   how that language would, in fact, allow that.

24             MR. FERRARIO:  Our reading -- yeah, I think -- Well,

25   I can look at it again.  Our reading of it is -- well, one is

1   it doesn't have this idea that it's a straight line of contact.

2   So the point where --

3      THE COURT:  I guess what you're -- I'm sorry to

4   interrupt.  I guess what you're suggesting is that where it

5   discusses beginning to curve downward from the superior spring

6   element, that that doesn't -- certainly doesn't require

7   whatever happened before that to be parallel.

8      MR. FERRARIO:  I think it's just that.  Yes, that's

9   correct.

10     THE COURT:  And in your view it may not be required

11  that there be anything happening, parallel or otherwise, before

12  it starts to curve downward from the superior spring element,

13  right?

14     MR. FERRARIO:  Yes, Your Honor.

15     THE COURT:  Thank you.

16     Go ahead.

17     MR. LYDEN:  Yes.  On the subject of the anterior

18  tangent point, I feel that the defendants have kind of got it

19  mixed up with the idea that the inferior spring element is

20  supposed to be tangential in relationship to the superior

21  spring element.  I show examples of that.  That's very

22  possible.  But I also show many examples where that is not the

23  case.

24     What is true --

25     THE COURT:  Just so I'm clear, where what is not the

1    case?

2            MR. LYDEN:  Where the inferior spring element does

3    not have a tangential relationship to the superior spring

4    element, where it does not curve from a point of tangency.

5            What the anterior tangent point is all about is when

6    you draw a curve, you know, you have a circle and the circle

7    has a radius.  A small circle gives you a very tight radius, a

8    large circle gives you a longer radius and a more gentle curve.

9    And what the anterior tangent point is is when you have an

10   inferior spring element that is curved, it is a curved line

11   that's going to have a radius of curvature.  And when you do

12   this in engineering drawings or even with a French curve with

13   your hand, you have an origin point, you have the length of the

14   radius, which defines how curved it is, sharp or gentle, and

15   the point at which you start on that circle to generate the

16   curve is what I call the anterior tangent point, because at

17   that point you can draw a line tangent to the circle and you

18   identify a spot on the circle where you're starting from.  And

19   you're also, by picking your starting point and then indicating

20   what the radius is, you're defining the curvature, sharp or

21   not.

22           So it really has to do with the point at which you

23   generate the curve.  It has nothing to do with whether the

24   inferior spring element has to be tangential in its shape and

25   curvature with respect to the superior spring element.

1    THE COURT:  What's your dispute with the idea of a

2    straight line of contact?

3    MR. LYDEN:  Well, that's the other thing here.  The

4    anterior tension point is a point, it is not a line.  Now, if

5    you take a shoe like this (indicating), and you generate your

6    curve and you create a single anterior tangent point to create

7    the curve in one slice of space here, and then you move across

8    it with multiple anterior tangent points, you then can connect

9    those points and that will generate a line.  And what that line

10   is is where the two parts mate or lay up against one another.

11   And that line is also consistent in my patent with not where

12   the flexural axis is, because it's the joint between the two

13   parts.

14   So the anterior tangent point is a point, it's not a

15   line.  You can connect anterior tangent points to create a

16   line, but that's -- that's all it really is there.

17   Now, there was one spot in the specification where

18   they noticed an error in connection with figure 617, where I

19   had more line, you know, kind of stuck in there.  And, frankly,

20   it's an error, and that one glitch -- there's other figures

21   like, I think, 523, the same things are shown.  And they're

22   looking at some -- what they see as lines on -- for example, I

23   think it's 523.  And if you actually look at the figure,

24   there's a demarcation on the left where I'm incorporating off

25   the part, saying here's the middle part of the part, here's the

1   tail end part of the part, here's the front.  And those lines

2   are basically defining those segments of the part.  And yes,

3   the lines can be generated by connecting a bunch of anterior

4   tangent points and also the posterior tangent point, which

5   never lays up against anything, it's out there in free space,

6   but it's a tangent point because that's where that curve was

7   generated with the radius.  So --

8            THE COURT:  Thank you.  That's all I need to hear.

9            MR. LYDEN:  -- I hope that explains something there.

10           THE COURT:  While we're talking about points, let's

11   talk about "anteriormost side."  And --

12           MR. LYDEN:  Would you like me to speak to that?

13           THE COURT:  No, I'm going to start again with the

14   defense here.

15           Let me just ask you what your complaint is with

16   plaintiff's proposed construction of "anteriormost side."

17           MR. FERRARIO:  Sure.  I'll just pull this up so we

18   have it side by side.

19           THE COURT:  Just so I can get it in my head a little

20   clearer, it seems that both of you agree that we're talking

21   about being closest to the footwear's anterior side.  That's

22   what you mean when he says, "the front of the article of

23   footwear," right?

24           MR. FERRARIO:  Correct.

25           THE COURT:  And so that you're in agreement on.

1      And so the main difference seems to be that you use

2  the word "surface," and he uses the word "part" of the spring

3  element.

4      What's the difference?

5      MR. FERRARIO:  This dispute really came to a head

6  when we looked at his infringement contentions.  And what

7  happens is, it's clear he's reading that side out of the claim

8  term.  So it doesn't even require a side.  It can be in the

9  same surface as the bottom surface.  So the reason we proposed

10 our construction was to make sure there has to be a separate

11 side.

12     THE COURT:  A separate side -- a separate side to the

13 inferior spring element?

14     MR. FERRARIO:  A separate side to the inferior spring

15 element.

16     THE COURT:  So that's saying it could be the same as

17 the bottom?  You mean it doesn't have to be a part of the

18 inferior spring element, it could be a part of the superior

19 spring element?

20     MR. FERRARIO:  No, no, I'm sorry, Your Honor.  It has

21 to be part of the inferior spring element but it has to be a

22 separate side, as opposed to the bottom.  There has to be six

23 separate sides to this construct, just as he describes and

24 claims.  He claims six sides in the claim element:  an interior

25 side, posterior side, a medial side, a lateral side, a top

1    surface, bottom surface.  And when we go to look at the

2    specification -- for example, figure 516 -- it shows these six

3    sides very clearly:  top, bottom, four sides of the rectangle.

4    And this is in the disclosure of the '797 patent.

5         Now, the way he's interpreting it, using infringement

6    contentions, is if you look at the shoe, he's taken what is the

7    surface, and this is sort of an "S" shape at best (indicating),

8    and he's saying, well, this is the anterior side and this is

9    the bottom surface.  And they're the same surface.  So he's

10   effectively read the anterior side or the anteriormost side out

11   of the claim.

12        THE COURT:  So your concern is that his claim

13   construction would allow him to claim where there is a side

14   connecting with the superior spring element, but also where

15   it's not a side, it's -- either it's the bottom of the spring

16   element or it's a point or something like that?

17        MR. FERRARIO:  Yeah.  Essentially --

18        THE COURT:  I'm going to limit it to inferior spring

19   elements that have an actual side that connect to a superior

20   spring element.

21        MR. FERRARIO:  Just as he shows in his patents, where

22   there's a bottom surface and then there's a side that goes up,

23   there needs to be that side.

24        THE COURT:  And your principal authority for doing

25   that is just that he has claimed sides?

1    MR. FERRARIO:  It is that he has used six different

2    words, yes, as well as the disclosures in the specification

3    which completely support and show the six distinct sides.

4         THE COURT:  All right.  Thank you.

5         Mr. Lyden.

6         MR. LYDEN:  Yes, thank you.

7         THE COURT:  Just to tee it up a little more clearly

8    in terms of what I'm concerned about --

9         MR. LYDEN:  Sure.

10        THE COURT:  -- the real concern really has nothing to

11   do with the actual place where this all connects to the front

12   of the article of footwear.  It's what connects.

13        MR. LYDEN:  Right.

14        THE COURT:  And your opponents argue that the

15   connection has to be made by an actual side to an inferior

16   spring element.

17        MR. LYDEN:  Right.  They wish to argue that kind of

18   like a square house, you should be able to point to a square

19   slash kind of side.

20        Now, in my patent, that's not the way I use the word

21   "side."  For example --

22        THE COURT:  All right.  So I'm going to stop you

23   there.  That's a perfectly acceptable argument to use the word

24   "side" in other than its normal meaning.  And that's what

25   you're about to tell me, is because the normal meaning would

1    not include, you know, the two different locations on an S

2    curve or a point.  But to do that, and as you're probably

3    aware, patent law allows an inventor to be his own

4    lexicographer.

5            MR. LYDEN:  Right.

6            THE COURT:  You have to point to me where in the

7    intrinsic evidence you've told someone that "side" doesn't mean

8    what "side" normally means.

9            MR. LYDEN:  Yeah, I was about to kind of get to that,

10   but thank you.

11           THE COURT:  I only tee that up as much for your

12   benefit as mine, so you know where I'm concerned.

13           MR. LYDEN:  I get it.

14           For example, I'll start with the shoe and then I'll

15   move to the inferior spring element.

16           THE COURT:  I don't want you to start there.  Where I

17   want you to start is the actual language of the intrinsic

18   evidence that you point to that tells someone, this is what the

19   inventor meant by the word "side."

20           MR. LYDEN:  Right.

21           In my drawings and discussion, I point to this as

22   being the anterior side of the shoe, this is the posterior,

23   this is the medial and the lateral.  Now, if you look at the

24   shoe, I'm pointing at curves.  These are curved surfaces.

25   They're not flat side curves, flat sides like a box.

1      So when I use the word "side," you know, whether with

2   a shoe or you could speak with your anatomy, I have a right

3   side and a left side.  I'm not square but I do have sides.  And

4   so we're speaking about an object that, to start with, you can

5   hardly find a flat spot on the thing.

6      Now, when you start looking at the inferior spring

7   element, there's embodiments where you have a removable

8   inferior spring element, and it might have a front side that is

9   very abrupt, very squarish, or it might have one that just

10  tapers down to just a smooth point of contact.  And it could

11  still be removable.  And I've assumed these kind of things in

12  the patent.

13     The other embodiment that you got, which is more like

14  this one, is you've got inferior spring elements that protrude

15  from the superior spring element in a smooth curve.  And in

16  that case, when you look at it and say, well, where is the

17  anterior side of the spring, well, it's going to be the closest

18  part of the spring to the front of the shoe, the front side.

19  And how do you find that?  Well, with a drawing or if you've

20  got a good eye, you can look at it and you find the -- what's

21  called the -- some people call it an inflection point, some

22  people call it the deflection point.  It's a point at which

23  that inferior spring element begins to protrude from the

24  superior spring element, where it begins to emerge.

25     And the front side of that defines --

1    THE COURT:  Would you stop for a minute.  I'm
2 tracking you.  The only reason I'm interrupting you is not to
3 be rude, but when I know where you're headed, with the limited
4 time that I have, if I let you go on, then you'll waste time
5 you need to spend on something else.
6    MR. LYDEN:  Sorry.
7    THE COURT:  So, again, I was looking for evidence of
8 where one would look to get this special definition of "side,"
9 and I think you told me two places to look:  one is that you
10 use in the patent the term "side" to describe locations on the
11 shoe itself, and your argument is that since one skilled in the
12 art would know that those sides are not flat, you wouldn't go
13 looking for flatness every time you used the word "side."  Is
14 that right?
15    MR. LYDEN:  Correct.
16    THE COURT:  And the second is that you have
17 embodiments of the inferior spring element where it would be
18 difficult to locate something classically thought of as a side
19 because of their curvature; is that right?
20    MR. LYDEN:  Correct, just as is the case with the
21 adidas Springblade shoe.
22    THE COURT:  Am I missing anything else that you want
23 to point to where one would say, well, this is what he means by
24 the word "side" in the intrinsic evidence?  I'm asking you.
25 Those are two.  Is there anything else?

1        MR. LYDEN:  I'm sure the word is used throughout the

2  file history many times.  It's used in the patent many times.

3  I do believe that there are some images that show this, and I

4  believe they're in the materials that I've provided today.  If

5  you go through those, you can see that.

6        THE COURT:  Thank you.

7        What's your response to the idea that those two

8  points of evidence would teach someone that "side" has a

9  particular meaning in this patent?

10       MR. FERRARIO:  I would say with respect to the first

11  point, I'm not entirely certain that the shoe is described as

12  an anterior side and a posterior side.  I'd want to go back and

13  check, because I think there are anterior -- there's an

14  anterior of the shoe and a posterior of the shoe.  I'm not sure

15  if it's side.

16       But even setting that aside, our construction doesn't

17  require that these sides be flat, just separate and distinct

18  from another side.  So you would not say that the anterior part

19  of the shoe is the same as the medial or lateral part of the

20  shoe.  You could not confuse those two.  They would have

21  separate and distinct sides to them.  And that is what our

22  construction counsels.  So that would be my response to the

23  first point.

24       With respect to the second --

25       THE COURT:  I'm just trying to visualize your

1    argument.  So does this come up with embodiments that come to a

2    point?  Is that an issue?

3              MR. FERRARIO:  With embodiments that come to a point?

4              THE COURT:  What I'm curious about is his definition

5    that he's proposed, I guess your concern is that it could

6    somehow end up describing the same thing as the bottom side of

7    the spring element.

8              MR. FERRARIO:  I think that his proposed definition

9    would allow him to do just what he tried to do in his original

10   contention, which is to say this surface is the both the bottom

11   and the anterior side.  And we think that's incorrect.

12             THE COURT:  All right.

13             MR. FERRARIO:  If Your Honor may indulge, there is,

14   we think, a very clear picture that we have in our brief of the

15   embodiment where there's no identification of a side, there's

16   nothing here that says, hey, this is the side.  That's one

17   embodiment.  And then he has another picture in the patent

18   which shows very clearly that there is a side.  And that's

19   where he labels it -- Do you know what figure that is?

20             So 541 -- I'm sorry, 451 very clearly identifies --

21   and this is in the brief -- an inferior spring element that has

22   this wall that -- it doesn't have to be flat, it just has a

23   separate and distinct side, whereas he has other embodiments

24   that don't have that side.  When that is there, that's

25   disclosed as the anteriormost side.

1        THE COURT:  Are you able to show me an embodiment
2   that does not have that separate side?
3        MR. FERRARIO:  I think that the embodiment that was
4   discussed in the briefing is this one here that is described as
5   not having a distinct separate anteriormost side.
6        THE COURT:  All right.  Thank you.  And that is
7   figure 451 in the patent?
8        MR. FERRARIO:  Yes.  Yes, Your Honor.
9        THE COURT:  Thank you.  All right.
10       Yes, sir?
11       MR. LYDEN:  I guess the only thing I might add is
12   that when you're looking for this side, when you're dealing
13   with an embodiment that has a smooth curve and you don't have,
14   you know, a flat-sided edge to it, it's going to be close to
15   where this anterior tangent point is and where this line that
16   can be generated by joining that, because that's where the two
17   parts mate on the front side of the inferior spring.  And it's
18   going to be very close to where the flexural axis is, where the
19   two come together and where they bend from.  So both of those
20   things put you pretty close to where that front side of that
21   spring is, and --
22       THE COURT:  The real question is did you actually
23   claim or did you actually submit embodiments that don't have an
24   anteriormost side?
25       MR. LYDEN:  I'm sure, I think --

1          THE COURT:  Or at least not one that's separate and

2    distinct from other sides of the inferior spring element?

3          MR. LYDEN:  You know, I think I have just about every

4    wording in there, where you've got something that's attachable,

5    very flat side, some that are somewhat abrupt, some that are

6    perfectly smooth -- smooth curve, but they're all going to have

7    that deflection point, they're all going to have that point

8    which they break from the superior spring element, and that

9    marks where the inferior spring element begins and where the

10   superior spring element ends, and that then establishes where

11   the front side of the thing is.

12         THE COURT:  All right.  Thank you.

13         Let me turn with that point back to adidas for just a

14   moment.  So I suppose I was going to say speaking

15   metaphysically, but it's actually probably physically, that in

16   any way in which the inferior spring element is connecting to

17   the superior spring element, we might call it as small as a

18   point and not a distinct side, meaning a separate surface, but

19   even a line of points, wherever that is in the physical world,

20   represents something other than an imaginary point -- in other

21   words, a side of some kind, doesn't it?  I didn't phrase that

22   very well, I guess, but --

23         MR. FERRARIO:  I think I understand.

24         THE COURT:  But the entire point of contact here,

25   mechanically speaking, has to represent at least at some

```
 1   microscopic level a distinct surface from anything else, right?
 2            MR. FERRARIO:  Certainly I think at any point where
 3   there's something that's coming off something else in a curve,
 4   I would agree at some point there is material there which is
 5   some form of a side.  I don't know -- at least at the
 6   microscopic level.  But I think when you put it in the context
 7   here of what's disclosed and what's described, I think I heard
 8   Mr. Lyden say there's all these different variations, and some
 9   of which have a separate and distinct side and some of which
10   don't.  And I think, from my perspective, when I read the
11   claims, there are some claims that don't require anteriormost
12   side.  But if you're going to claim it, you have to look to see
13   what's in the specification, and it has to be a separate and
14   distinct side.
15            THE COURT:  All right.  Thank you.
16            I think the last term in play is the word "affixed."
17   And so adidas has suggested that it must be affixed using some
18   sort of adhesive or mechanically mating parts.
19            Where would you get that from the patent itself?
20            MR. FERRARIO:  Yes, Your Honor.  So that is in column
21   8, lines 15 to 20.  And that disclosure discloses adhesives,
22   fasteners, or other mechanically made parts and the like.  And
23   that's expressly found in the specification.
24            THE COURT:  Why -- so you believe that then covers
25   all possible uses of the meanings of the word "affixed" in the
```

1    patent, or is it just one of several possible meanings?

2           MR. FERRARIO:  What I think is that in the context of

3    the specification, the way it's also used in another section

4    means that "affixed" is where you take two separate things and

5    put them together.  And how you put them together means

6    fastener or adhesive or chemical or the like, as opposed to or

7    alternatively and distinguished from integrally formed pieces.

8           THE COURT:  So isn't that the real distinction you're

9    trying to draw, not how they're attached together, but just

10   that they must be somehow functionally attached together, once

11   having been two parts, now rendered functionally one?

12          MR. FERRARIO:  Yes, and not integrally formed.

13          THE COURT:  Meaning what?

14          MR. FERRARIO:  Meaning molded together.  Form is

15   what --

16          THE COURT:  If in the manufacturing process you made

17   the inferior and the superior spring elements all at once as a,

18   quote, spring element, in your view that wouldn't work,

19   wouldn't meet these claims?  They have to be two separate

20   parts?  I'm not sure you care whether they're glued together or

21   somehow some other way put together, just as long as they're

22   put together; is that right?

23          MR. FERRARIO:  That's right.

24          THE COURT:  All right.  Thank you.

25          Your response?

1          Well, first let me ask you -- Let me be more precise.

2     Are you claiming that this language would cover a spring

3     element made all at once; that is, as he put it, integrated,

4     where what you call a superior spring element and an inferior

5     spring element are made as one single piece, let's say, in the

6     manufacturing stage.  Would that meet this claim?

7          MR. LYDEN:  Yes.  That was my intention in using the

8     word "affixed."  I went through a --

9          THE COURT:  Well, if they were never separate, then

10    how do they become affixed?

11         MR. LYDEN:  Well, you know, if we look at the words:

12    "affixed" and "attached," they can be used both ways, and you

13    can find that in patents and in common usage, like my arm is

14    attached to my body, but then we have attachments to emails

15    that are separate things.  And so the words can go both ways.

16         And because in my patent I have versions where the

17    inferior spring element is removably attached or removably

18    secured, I thought the word "attachment" smacked a little bit

19    too much of being removable and being separate, and I thought

20    the word "affixed" was more neutral.  And that's why I chose it

21    over "fixed," which is what they use in their patent.  Similar

22    patent, similar structures, they used the word "fixed," I used

23    the word "affixed."  Neither one of us used "attached," I

24    guess.

25         So there was some thought about why to choose that

1   word and specifically had that word cover both embodiments

2   because both of them were present and being taught in my

3   patent.  So why don't I stop there.

4           THE COURT:  Thank you.

5           I'm going to a break -- unless you have something

6   else you want to add, I'm going to take a break and think about

7   this and come back with my ruling shortly.

8           MR. FERRARIO:  Your Honor, just one correction.  I

9   think when we were talking about anteriormost side earlier, I

10  just want to note that the figure in our brief is actually

11  figure 456, and it's the same -- it's essentially the same

12  figure as 451, which I identified during oral argument.  I just

13  wanted to make that record clear.

14          THE COURT:  All right.  Thank you.

15          MR. LYDEN:  Can I make a last point on the affixed

16  part?  It's a little bit --

17          THE COURT:  What are we talking about?

18          MR. LYDEN:  The affixed business here.

19          THE COURT:  All right.

20          MR. LYDEN:  With regard to "affixed," and whether

21  they were ever separate and whether or not -- you know, when

22  you make a spring element out of carbon fiber, and if you want

23  to make it an integral part, it's made by laminating 25 to 35

24  pieces of carbon fiber upon one another, and then you vacuum

25  bag it, you cook it in an oven and bake it, basically, and then

1    you get the unitary piece out of it.  But it was never like one

2    thing to begin with.

3           The same thing is true even when you injection mold.

4    It starts out as beads of plastic of different formula being

5    mixed, put in a screwdriver, melted, blended, and then

6    injected.  So it's not like this unitary piece comes out of

7    nowhere of the ether.  In neither case were they ever one thing

8    in the beginning.  You're always putting something together,

9    whether you put it by fusing it mechanically, bonding it,

10   adhesive or whatever.  And that's the case.

11          THE COURT:  I understand what you're saying.  Even

12   adidas can't make a shoe ex nihilo.  So there you go.

13          THE CLERK:  This court is in recess.

14          (A recess is then taken.)

15          THE COURT:  All right.  We got five terms to be -- or

16   phrases to be defined today.  The first one is "similar to."

17   And I have one ruling and one tentative thought on that.

18          The first is that it does not require nor is it

19   really susceptible of further definition.  So, in that sense,

20   it has a plain and ordinary meaning, and I'm not going to

21   define it any further.  That's the *Markman* ruling:  no further

22   definition.

23          Adidas also makes the argument -- has made the

24   argument both now and in its briefing that this term is

25   indefinite.  And although it's, I think, appropriate to bring

1   it up now, it's not a classic *Markman* ruling in the sense of

2   defining the term; rather, it's something a little broader than

3   that in saying that the term is flawed in this way.

4          And I'm going to think about that.  I think that's

5   correct.  I think it's indefinite because one can't know from a

6   wide variety of possibilities which one is being claimed here.

7   But I'm going to take that portion of this under advisement.

8          So certainly I'll not define it any further.  I may

9   rule that it's indefinite or I may require it, as a different

10  sort of argument, be brought up in summary judgment.  One of

11  those latter two is in the future.  I'll let you know.

12         The second phrase that was said by adidas to be

13  indefinite I don't find to be indefinite.  And that's the

14  phrase "said transverse axis."  And so this phrase,

15  particularly inclusive of the word "said," is being defined

16  right now for our purposes only for the '878 patent.  And I

17  adopt plaintiff's proposed definition of "said transverse

18  axis."

19         Then just to read it into the record so that you're

20  clear on it, that would be, "transverse axis corresponds to a

21  straight line drawn perpendicular to the longitudinal axis

22  which also intersects the flexural axis of the inferior spring

23  element at the same point."

24         The only change I'll make to that definition, given

25  what I've said about it being limited to the phrase found in

1    '878, is that just before the first word I read, "transverse,"

2    I'm going to put the word "said" so that we're clear that what

3    I'm defining is "said transverse axis."

4            Now, "transverse axis" isn't really something the

5    parties dispute the meaning of, and it will mean what it means

6    in '878 and '797.  But the particular phrase "said transverse

7    axis" I give the meaning I just described only in '878.  What

8    that might mean down the road for '797, I'm not sure, but

9    that's the limit of my ruling.

10           The next word to be defined is "affixed."  And the

11   parties have proposed relatively similar thoughts about what it

12   means.  I think I understand the basic dispute.

13           Here is the definition I'm giving it.

14           "Fixed:  Two separate components that are attached to

15   and have some functional relationship with each other."

16           And I'll give you this in writing later.  "Two

17   separate components that are attached to and have some

18   functional relationship with each other."

19           The next phrase I'll define is "anteriormost side."

20   And I've heard the dispute there.  I accept defendants'

21   proposed definition, "The surface distinct from any other side

22   or surface that is closest to the footwear's anterior side."

23           And what I think that does is simply require that of

24   the six sides of the spring element, the inferior spring

25   element, no side can play two roles.  It can't be, you know,

1    the inferior side and the anterior side all at once.

2             I'm not by this definition requiring that the side be

3    somehow some sort of rectangular or squared-up surface like the

4    side of a house at all, just that it be distinct from, let's

5    say, the inferior side.

6             All right.  Then I think that leaves us with

7    "anterior tangent point."

8             Mr. Lyden, do you have your proposed definition in

9    front of you there?

10            MR. LYDEN:  Not immediately, but I believe it was in

11   my responsive brief.

12            THE COURT:  Let me just give the ruling.  I'll ask

13   you a question about it after I read it out loud in just a

14   moment.

15            MR. LYDEN:  Sure.

16            THE COURT:  I don't believe that a straight line of

17   contact is necessary as part of a definition of "anterior

18   tangent point."

19            Mr. Lyden has proposed the following definition:

20   "where on the top side of an inferior spring element portion it

21   begins to curve downward from the superior spring element

22   portion of a larger spring element.

23            And although certainly not poetic, I think that

24   probably expresses best what "anterior tangent point" means.

25            My only question is this.  You suggest that it

1    happens when the top side of the inferior spring element begins
2    to curve downward, and I don't know whether you mean curve
3    literally or just slope downward.  What is it you're saying
4    there?
5            MR. LYDEN:  I use the word "curve" here, and --
6            THE COURT:  And that's because all of your inferior
7    spring elements are curves?
8            MR. LYDEN:  No.  Some of them -- there are some in
9    the patent that are actually straight.
10           THE COURT:  In which case it would just slope
11   downward not curve?
12           MR. LYDEN:  It would slope not curve.  But I think --
13           THE COURT:  Let me ask you this, then.  Do you
14   have -- is there a reason that you would object to me changing
15   the word "curve" to "slope"?
16           MR. LYDEN:  Do you believe that "slope" includes
17   sloping curve?  I'm all right with "curve."
18           THE COURT:  All right.  Then we'll leave it at
19   "curve."
20           So I'll give it again.  You'll get this in writing.
21   "Where on the top side of an inferior spring element portion it
22   begins to curve downward from the superior spring element
23   portion of a larger spring element."
24           I'll give you a minute order with these definitions
25   in it.  That concludes the *Markman* portion of this hearing.

1          I don't want to keep you too long, but while you're

2    here, let's just check in on the progress of the case.  Where

3    are we, for example, with relation to discovery?  I'll start

4    with adidas.

5          MR. FERRARIO:  Your Honor, we have not -- we've done

6    all of the document production and discovery in the case.

7    We've not yet done deposition or fact discovery.  I understand

8    the discovery schedule closes at the end of January.

9          THE COURT:  How do you feel about that?

10         MR. FERRARIO:  I think it should be okay.  I have a

11   little concern about some of the scope of some of the requests

12   that have come from Mr. Lyden, and I think that we are looking

13   at those, and we'll perhaps meet and confer with Mr. Lyden over

14   the next week or so to try to see if we can corral some of the

15   discovery requests a bit.

16         THE COURT:  All right.

17         MR. FERRARIO:  I'm happy to go into more detail if

18   you'd like, or --

19         THE COURT:  No.  I just want to say to both of you --

20   to you, Mr. Lyden, in particular.  You wouldn't necessarily be

21   aware of this.  So on December 1, amendments to the discovery

22   rule come into play, and they require judges to incorporate

23   even more vigorously than in the past a concept of

24   proportionality, where the expense of discovery shouldn't cost

25   more than what the discovery ends up being worth.  So that's

1    something I'm going to look at carefully.  Just make sure you

2    hone in on what you really need and aren't claiming more.

3             MR. LYDEN:  Yes, Your Honor.  If you can recall --

4    and you get so many cases in, I know.  We had an oral hearing,

5    a Rule 16 conference that related to discovery back in June, I

6    think it was.

7             THE COURT:  Yes.

8             MR. LYDEN:  One of my concerns there was that there

9    was reluctance or hesitation on the part of adidas to produce

10   discovery.

11            Now, back in June, early July, I gave to adidas over

12   48,000 pages of discovery that they got from me, and it was

13   well organized.  And one of my concerns -- and they were made

14   aware of this -- I'm at a point where I feel I have to file a

15   motion to compel because I've only received less than 6,000

16   pages of documents, and most of it has been their prior art

17   search relating to patents.  I would say of the 50-something

18   requests that I have, I think they had close to 100, 90 percent

19   of it has not been yet produced.  And we've had discussions

20   about it.  They've pushed back and basically indicated that

21   they don't want to give me these things.  And I've tried to

22   explain this is why I want this, this is reasonable.  I don't

23   believe I have any unreasonable requests.  And so --

24            THE COURT:  Let me just say this about that.  It's

25   not unusual that the bulk of discovery occurs after a *Markman*

1    hearing so that the parties can have some idea of what's really

2    in play versus not.

3            MR. LYDEN:  Sure.

4            THE COURT:  But we're on a tight timetable, so I want

5    you to work hard at making this happen.  So now I do expect the

6    bulk of discovery to go about quickly.

7            MR. FERRARIO:  Understood, Your Honor.

8            THE COURT:  And then that closes the end of January,

9    and there's a briefing schedule that has us with an established

10   summary judgment hearing date.  You'll have to remind me if

11   that's true or not.

12           MR. FERRARIO:  There is a deadline for summary

13   judgment briefing, Your Honor, but as I read it, it doesn't

14   preclude moving earlier in -- as I read the order.

15           THE COURT:  I offered to set deadlines for briefing

16   but not a hearing date.  What did we do in this case?

17           MR. FELDMAN:  In this case we do have a hearing date

18   on the calendar, which I believe is August 12th of 2016.

19           THE COURT:  You could build the Empire State Building

20   faster than that.

21           MR. FELDMAN:  And I think that that was based off the

22   deadline for the summary judgment motions, which was in early

23   June.

24           THE COURT:  All right.  Well, as you say, there's

25   nothing that prevents us from moving more quickly if you're

1  ready with your briefing, and we can move it up if necessary.

2  Otherwise, we'll move towards that date, and that gives

3  everybody more than enough time.

4          Anything else we need to bring up while you're here

5  for the record?

6          MR. FERRARIO:  Not for defendants, Your Honor.

7          THE COURT:  For you, Mr. Lyden?

8          MR. LYDEN:  I don't think so, Your Honor.

9          THE COURT:  Thank you all for being here today.

10  We're adjourned.

11          THE CLERK:  This court is now adjourned.

12          (Proceedings concluded.)

1

2                                    --oOo--

3

4          I certify, by signing below, that the foregoing is a

5   correct transcript of the record of proceedings in the

6   above-entitled cause.  A transcript without an original

7   signature or conformed signature is not certified.

8

9

10   /s/Bonita J. Shumway                    11/19/2015
     _____        _____
11   BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
     Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25